**Amended 02/27/2020**

1

2              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF TEXAS
3                     DALLAS DIVISION

4  UNITED STATES OF AMERICA,   )   **Case No. 3:20-CR-0008-E-1**
                               )
5          Plaintiff,          )
                               )   Dallas, Texas
6  v.                          )   January 31, 2020
                               )   10:00 a.m.
7  ROBERT BURNEY CAPPS,        )
                               )   HEARING RE: REPORT OF
8          Defendant.          )   VIOLATION OF CONDITIONS OF
                               )   PRETRIAL RELEASE (12)
9  _____ )

10                    TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE IRMA CARRILLO RAMIREZ,
11              UNITED STATES MAGISTRATE JUDGE.

12 APPEARANCES:

13 For the Government:         Lindsey E. Beran
                              UNITED STATES ATTORNEY'S OFFICE
14                            1100 Commerce Street, Suite 300
                              Dallas, TX  75242-1699
15                            (214) 659-8600

16 For the Defendant:         Sally G. Goodman
                              LAW OFFICE OF SALLY GOODMAN
17                            1700 Commerce, Suite 1300
                              Dallas, TX  75201
18                            (214) 748-3230

19 For U.S. Probation:        Lisa Evans

20 Court Recorder:            Marie Castañeda
                              UNITED STATES DISTRICT COURT
21                            1100 Commerce Street, Room 1452
                              Dallas, TX  75242-1003
22                            (214) 753-2167

23 Transcription Service:     Kathy Rehling
                              311 Paradise Cove
24                            Shady Shores, TX  76208
                              (972) 786-3063

25      Proceedings recorded by electronic sound recording;
         transcript produced by transcription service.

1          <u>DALLAS, TEXAS - JANUARY 31, 2020 - 10:06 A.M.</u>

2          THE CLERK:  All rise.

3          THE COURT:  Good morning.  Please be seated.  All

4    right.  United States of America versus Robert Burney Capps.

5    This is Case 3:20-cr-8-E.  And pursuant to the District

6    Court's order of reference, before the Court this morning is a

7    report of violation of conditions of pretrial release.

8        Ms. Goodman, if you and Mr. Capps would please approach

9    the podium.  Or, actually, why don't you just stand where you

10   are right there, Mr. Capps.  Mr. Capps, have you received a

11   copy of the report of violation of conditions of pretrial

12   release?

13          THE DEFENDANT:  (faintly)  Yes, ma'am.

14          THE COURT:  I'm sorry.  I can't hear you.

15          THE DEFENDANT:  (faintly)  Yes, ma'am.

16          THE COURT:  Ms. Goodman, can you -- let's move over

17   to the -- I need to be able to have you on the record.  All

18   right.

19          THE DEFENDANT:  Sorry.

20          THE COURT:  Yes.  You have received a copy of the

21   report?

22          THE DEFENDANT:  Yes, ma'am.

23          THE COURT:  And have you had a chance to read it?

24          THE DEFENDANT:  I've been briefed by my attorney.

25          THE COURT:  All right.  It's not very long.  Do you

1   need a few minutes to read it?

2           MS. GOODMAN:  Need additional time to read the

3   report?

4           THE DEFENDANT:  No, ma'am.

5           MS. GOODMAN:  Okay.  We have reviewed the report

6   thoroughly, Your Honor, in my office.

7           THE COURT:  All right.

8           MS. GOODMAN:  So it's that's the Court --

9           THE COURT:  And so, sir, do you understand the

10  condition of pretrial release that is alleged to have been

11  violated in this report?

12          THE DEFENDANT:  Yes, Your Honor, I do.

13          THE COURT:  You are entitled to a hearing for the

14  Court to determine whether your conditions of pretrial release

15  should be revoked.  Do you understand that you have that

16  right?

17          THE DEFENDANT:  I understand.

18          THE COURT:  All right.  And Ms. Goodman, Mr. Capps

19  would like to proceed with his hearing?

20          MS. GOODMAN:  He would, Your Honor.

21          THE COURT:  All right.  You may have a seat.

22      The Government may call its first witness.

23          MS. BERAN:  Thank you, Your Honor.  May I have just

24  one moment?

25          THE COURT:  You may.

Evans - Direct                          4

1     (Pause.)

2          MS. BERAN:  Your Honor, the Government would like to

3    call U.S. Probation Officer Lisa Evans.

4          THE COURT:  Officer Evans?

5            LISA EVANS, GOVERNMENT'S WITNESS, SWORN

6          THE COURT:  Please be seated.

7                        DIRECT EXAMINATION

8    BY MS. BERAN:

9    Q    Good morning, Ms. Evans.

10   A    Good morning.

11   Q    Can you please state your name for the record?

12   A    It's Lisa Evans.

13   Q    And where are you employed?

14   A    I am a United States probation officer.

15   Q    And what is your current job kind of duties, if you will?

16   A    I am a -- so, I'm a pretrial officer, and I handle

17   individuals from the time that they are arrested through that

18   time frame until they ultimately are sentenced and then go to

19   prison.

20   Q    Okay.  And are you -- sorry.  Did I interrupt?

21   A    No.

22   Q    Okay.  Are you the pretrial officer for -- who is

23   supervising -- I guess is supervising the correct word?

24   A    Yes.

25   Q    Who is supervising Robert Burney Capps, the Defendant?

1   A     I am.

2   Q     Okay.  And approximately when did you begin that, in that

3   role?

4   A     Well, Mr. Capps was released on bond on Friday, January

5   10, 2020.  At that time, my supervisor assigned him to me.

6   However, I was not present in court that day.  So we scheduled

7   an appointment for him to come in and report to me on Tuesday,

8   January 14th, --

9   Q     Okay.

10  A     -- 2020.

11  Q     And is it your understanding that on -- before January

12  14th, perhaps on January 10th, both at the initial arraignment

13  -- or, initial appearance and the arraignment, that Mr. Capps

14  -- that your supervisor explained to Mr. Capps what the

15  conditions of pretrial release were?

16  A     I believe he very briefly went over them, but I know that

17  his attorney at the time, Mr. Jett, reviewed through them.

18  Q     Reviewed through them, excuse me, with your supervisor?

19  A     No, no.  Mr. Jett would have reviewed them with Mr. Capps,

20  knowing how Judge Ramirez conducts court.  Judge Ramirez has a

21  canned statement that she says to every individual when she's

22  releasing them on bond, and at that time the attorney goes

23  over the conditions with the client and then Judge Ramirez

24  makes a statement to the effect of, you know, We want to make

25  sure that you understand these conditions.  By signing this

1    order, --

2    Q    Yes.

3    A    Okay.

4    Q    Yes.  Yes.  Okay.  And so then you met with Mr. Capps on

5    January 14th?

6    A    I did.

7    Q    And what conditions in particular did you go over with

8    him?

9    A    We went over every condition.

10   Q    Okay.  And as it relates to the -- did you file on -- in

11   this matter a report of violation of conditions of pretrial

12   release on January 24, 2020?

13   A    I did.

14   Q    Okay.  And this report of violation indicates that --

15   well, what does it indicate?

16   A    So, it was discovered that on January 13th, Mr. Capps had

17   entered into the Eastern District of Texas -- specifically,

18   Plano, Texas.

19   Q    And how did you come -- let's talk about this.  So that

20   was January 13.  Mr. Capps had not yet met with you; is that

21   correct?

22   A    That is correct.

23   Q    Okay.  And when he met with you on January 14th, did you

24   specifically tell him what the Northern District of Texas

25   consisted of?

Evans - Direct                                7

1   A    I did.  So, as we were reviewing through all of the

2   conditions, I'm very thorough because I want, as Judge Ramirez

3   does when they're walking out of the courtroom, I want

4   individuals to know, when they walk out of my office, the

5   parameters, so that there's no question.  He was provided a

6   travel map, which I have, of the Northern District of Texas.

7   And I have myself a canned statement that I explain to every

8   individual, so it's basically to the effect of, I need you to

9   understand:  This means you cannot travel to Plano, you may

10  not travel to Allen, to the outlet mall, et cetera.  And so

11  people, you know, usually are like, oh, wow, okay.  And then

12  they have the map to reference.

13  Q    Okay.  And at that point, did Mr. Capps indicate to you

14  that he had traveled outside of the Northern District of

15  Texas?

16  A    He did not.

17  Q    And did he indicate to you that he understood what the

18  confines of his travel restrictions were?

19  A    He appeared to understand.  However, he was very

20  distraught and explained to me that he has business at

21  Ericsson and some other companies that are located in Plano,

22  in the Eastern District.  And at that time, I told him, You

23  may not travel there until -- his attorney at the time --

24  until Mr. Jett files a modification request with the Court.

25       He was also wanting to travel overnight, and I explained

1    to him that, being on location monitoring, its national policy

2    does not allow for overnight travel, and also the nature of

3    his charges is going to prohibit that as well.

4    Q   Okay.  And at that time, you did not know that he had

5    traveled outside of the Northern District?

6    A   I did not.  And nor did he state to me, I'm so sorry, I

7    went to Plano yesterday.

8    Q   And did you later learn that he had traveled outside of

9    the Northern District of Texas?

10   A   I did.

11   Q   On approximately what date did you discover that

12   information?

13   A   It was -- I'd have to reference a calendar.  It was

14   probably a day or two before January 24th, which was when that

15   violation report was submitted.

16   Q   Okay.  And I have a two-page document that is marked as

17   Government Exhibit #1.  It's in front of you, I believe.  It

18   looks like a -- it's B1 Total Access --

19   A   Yes.

20   Q   -- Mapping.  Do you see that?

21   A   Yes.  It's BI, but yes.

22   Q   Oh, BI?  Sorry.

23   A   No, that's okay.

24   Q   And can you -- it hasn't been admitted yet, so don't talk

25   about the content of it, but what is this document?

1   A   So, we are able to, obviously, track individuals who are

2   on GPS, and this is a screenshot verifying the date, the time,

3   and the location of where he was.

4   Q   And did you access and create this document in the course

5   of your ordinary business?

6   A   My coworker did, but yes.

7   Q   Okay.

8          MS. BERAN:  At this time, Your Honor, if I may

9   approach, I'd like to offer Government's Exhibit #1 into

10  evidence.

11         THE COURT:  Has Defense Counsel --

12         MS. GOODMAN:  No objection.

13         THE COURT:  It is admitted.

14      (Government's Exhibit 1 is received into evidence.)

15  BY MS. BERAN:

16  Q   And can you just briefly explain what that details?

17  A   Sure.  So, individuals who are on GPS are tracked

18  everywhere they go.  And for lack of a better term, there's

19  these little dots on the map that shows their location, and

20  then we can cross-reference and zoom in and see the actual

21  location of where they're at.  So that's, you know, basically

22  what this document is.

23  Q   Okay.  And what specifically does that show occurred on

24  January 13th?

25  A   So, on that date, he traveled north on the Dallas North

1   Tollway and he was found to be at a building located at 6900

2   Dallas Parkway.  So, we're -- that -- there's a building

3   there, and unfortunately, the monitoring specialist is the one

4   that knows how to zoom in and do that a little bit better than

5   myself, but, you know, there is a multi-story building there,

6   and then the cross-street would also be the other allegation,

7   which is Tennyson Parkway.

8   Q    Okay.  And just to be clear -- I don't have it directly in

9   front of me -- but is there an identifier on there to indicate

10  to you that that is, in fact, Mr. Capps?

11  A    Yes.

12  Q    Does it have his name or --

13  A    Yes.

14  Q    -- an identifying number?

15  A    Yes.

16  Q    Okay.  Perfect.  Thank you.  Are there any other concerns,

17  or have you had any other issues with Mr. Capps in his

18  pretrial release?

19  A    We have.  It was not noted on his violation report because

20  we've been working with him and his employer to -- it's a

21  little bit complicated because he is required -- he uses his

22  own personal technology equipment:  computer, laptop,

23  phone.  He was using -- he uses that for his job.  And so

24  before we could install that software, the monitoring software

25  on there, we needed to be able to verify with his employer,

1  because the monitoring software would be accessing their

2  proprietary information.  And we can't just arbitrarily go in

3  and violate a business and their --

4  Q    So you needed permission from them because there would be

5  a monitoring system that could potentially access their

6  proprietary information?

7  A    Yes.

8  Q    Okay.  And have you been attempting to work with his

9  employer on getting that --

10 A    So, --

11 Q    -- software installed?

12 A    -- it took some time.  So, and I can tell you the specific

13 dates of communicating with Mr. Capps.  He initially told me

14 that he provided some information to his employer, let's see

15 -- well, so, if I can back up.  On the date of his intake on

16 January 14th, he informed me that his employer is unaware of

17 his legal issues.  And I requested that he notify his employer

18 because I -- and that I needed somebody that I could follow up

19 with, explaining to him that I -- while I know he would not

20 lie to me, we have clients that do lie to us, so we have to

21 have an actual person that we can verify information with.

22      So then, the following day, I spoke with his attorney at

23 the time, Mr. Jett.  We spoke extensively about the travel and

24 the employer, and he was -- Mr. Jett was going to, in turn,

25 chat with Mr. Capps.

1    So then, on January 16th, I chatted again with the

2    Defendant about his electronics, and that's when he notified

3    me that he was on a temporary vacation from access to his

4    online tools with his employer.  But he advised that he was

5    not sure if he was going to disclose the details of his

6    charges at that time, which, you know, we wanted to give him

7    an opportunity to broach that subject with his employer.

8    Q    Right.  You all -- so at that point, then, your

9    understanding is the employer did not know?

10   A    They -- they did not know the nature of the charges or the

11   specifics, is my understanding, just that he was not to be

12   accessing devices -- I don't even want to go that far.  Just

13   that they were aware he had some legal issues that prohibited

14   him from using some technology.

15   Q    Okay.  So I guess did you continue to try to communicate

16   with both him and his employer to get the monitoring software

17   put onto his computer?

18   A    So, we continued or I continued to communicate with

19   him.  At that time, I still had not received a

20   representative's name for his employer to communicate

21   with.  So, he -- I spoke with him again on January 22nd and I

22   asked him about the status of him notifying his employer with

23   regard to installing the monitoring software, and that's -- at

24   that time he notified me he had changed attorneys and that

25   he's waiting for his employer to send a letter advising that

1    he is presently suspended from all their systems.  And, again,

2    I reminded him that follow-up would need to be made with his

3    employer about him not using technology.

4        And so, again, I was waiting for either the letter saying

5    that he's not using technology -- at least, he knew all along

6    that I had to verify with somebody that -- whether he was

7    using their equipment, his own equipment, or no

8    equipment.  Because he has this monitoring condition, we have

9    to follow up on that.

10   Q    So, to date, have you received either some sort of

11   confirmation or contact information from the employer?  I

12   mean, basically, at this point, have you received the

13   information that you need?

14   A    I have.  I finally have.

15   Q    And when did you receive that?

16   A    So, things started moving a little quicker after -- well,

17   his wife sent me an email.  And unfortunately, I myself had

18   had computer problems.  We were knee-deep in a raid and my

19   computer crashed.  So I was a little bit out of sorts.  But

20   his wife sent an email to me on his behalf on January 24th,

21   and it was basically just stating that the company is

22   suspending Bob's access in lieu of allowing the

23   monitoring.  Obviously, Bob is desperately trying to keep his

24   job.  This is according to his wife.  She'd asked me some

25   questions.  I didn't quite understand her questions.  So I

1    responded to her after I had access to a computer and just

2    told her I wasn't quite understanding, you know, what was

3    going on.

4        But at that time is also when I had discovered he had

5    traveled to Texas Eastern.

6    Q    Okay.  So, you were having these communications, and then

7    you continued to have communications until what point that you

8    received the information?

9    A    So, on January 27th, I was speaking with Mr. Capps, and we

10   were -- again, I was following up on the status of his

11   monitoring software.  And I had confirmed receipt of the email

12   that was sent by his wife.  However, in the course of that

13   communication, innocent as it may have been, Mr. Capps

14   referenced something with regard to the email he had sent me,

15   and I told him, I said, I'm going to stop you right there

16   because you're not to be using technology until this

17   monitoring software.  And he said, No, no, no, my -- I

18   composed it; my wife sent it to you.

19       So, on that same date, I explained to him, becoming a

20   little somewhat frustrated, because we do have 45 other

21   clients and we've been knee-deep in raids -- neither here nor

22   there, but we have more than just one client.  So, --

23   Q    Right.

24   A    -- and I explained to him that perhaps maybe a way to

25   alleviate some of these issues would be for him to provide his

1  employer with a copy of the bond conditions so that they could

2  understand exactly what was required.  I'm a firm believer in

3  transparency.  I think, with a lot of people who have charges

4  that are unsettling to employers, being able for everybody to

5  communicate, certainly, it's very beneficial.  And so I was

6  offering that to him.

7        I finally spoke with -- he finally gave me the green

8  light, so on January 28th I attempted to phone his supervisor,

9  Peter Spouse, and I left him a voicemail.  However, I received

10 a phone call back from the HR manager, Mike Masciarelli, but

11 before that is when I let -- I had Mr. Capps come into my

12 office.  I'm sorry, I know I'm jumping around.

13 Q    No, you're fine.  I think what would be important for the

14 Court to know, though, is just you've clearly detailed your

15 efforts.

16 A    Yes.

17 Q    And at this point, it took over two weeks, I think, based

18 on what you've said, correct?

19 A    To speak with the employer, yes.

20 Q    To speak with the employer.  And now there is -- is the

21 monitoring software on his computer?

22 A    No.  Because we were notified yesterday that Mr. Capps

23 unfortunately was terminated from his employment on January

24 29th.  But we were not notified on the 29th; we were notified

25 on the 30th, in the afternoon, when we were speaking with Ms.

1    Goodman.  I subsequently sent an email to Mr. Masciarelli

2    confirming that.  He confirmed it as well.  So he was

3    terminated on the 29th.

4         So you can't just install software --

5    Q    Okay.

6    A    -- right away.

7    Q    Okay.

8    A    We've explained this to Ms. Goodman.  We've explained this

9    to the Defendant, because multiple times he's like, I'm on my

10   way up to your office.  And we're like, Stop.  An appointment

11   has to be obtained through the monitoring company, and

12   sometimes it takes 24 hours for them to have an appointment

13   available.

14   Q    So, at this point, though, assuming Mr. Capps is able,

15   within the next hopefully 24 to 48 hours the monitoring system

16   can be put -- or, software can be put on his devices?

17   A    An appointment can be --

18   Q    An appointment can be made?

19   A    Yes.

20   Q    Okay.

21   A    An appointment can certainly be made.  Once we know

22   everything, an appointment can certainly be made.

23   Q    Okay.

24   A    And it's done remotely at his home.

25   Q    Okay.  He doesn't actually have to go anywhere?

1    A    He does not have to be here.

2    Q    Okay.  Are there any other issues that you feel that I've

3    not covered?

4    A    No.  I mean, I think that there's just a disconnect in

5    communication and/or, you know, when you were a child and the

6    game of telephone.  I don't know if that's the issue that

7    details are being miscommunicated, misheard, but that seems to

8    be pervasive in this dynamic.

9    Q    Okay.

10           MS. BERAN:  Nothing further at this time, Your Honor.

11           THE COURT:  Ms. Goodman?

12                        CROSS-EXAMINATION

13   BY MS. GOODMAN:

14   Q    Ms. Evans, you were not in court on January 10th when Mr.

15   Capps had his initial appearance and arraignment?

16   A    That's correct.  I was not present.

17   Q    All right.  So, your supervisor told Mr. Capps that he

18   would be meeting with you on January the 14th?

19   A    That's my understanding, yes.

20   Q    All right.  Now, just to review how Mr. Capps got to court

21   on January 10th, he was notified by case agents that he would

22   need to surrender on January -- he was notified by them on

23   January 9th and he agreed to surrender as they requested on

24   January 10th, voluntarily surrender.  Is that correct?

25   A    I have no knowledge of that.

1  Q    Okay.  So you're not aware that he did voluntarily

2  surrender to the jurisdiction of the Court?

3  A    I know that he appeared.  I'm not certain as to the means

4  with which he arrived in our building.

5  Q    All right.  So it is your understanding that on January

6  10, 2020 -- which was a Friday, correct?

7  A    Correct.

8  Q    That Mr. Capps appeared with his then-attorney of record,

9  Craig Jett?

10  A    Yes.  That's my understanding.

11  Q    So, inasmuch as you were not in court on January 10th, you

12  certainly heard nothing that Mr. Jett might have said in

13  court, nor were you privy to any communications that he might

14  have had with Mr. Capps?

15  A    Oh, of course not.

16  Q    Okay.

17  A    Of course not.

18  Q    So, it is your understanding that Mr. Capps, either

19  directly or by and through his attorney of record, was served

20  with the Order Setting Conditions of Release?

21  A    Can you repeat that?

22  Q    Okay.  It is your understanding that on January 10th,

23  after the initial appearance, Mr. Capps either directly was

24  handed the Order Setting Conditions of Release or his attorney

25  presumably was served with a copy of the Order Setting

Evans - Cross                                    19

1  Conditions of Release?

2  A    I have no idea how he was provided those conditions, --

3  Q    Okay.

4  A    -- unfortunately.

5  Q    Right.  So you really don't know what explanation, if any,

6  was given to Mr. Capps on January 10th, do you?

7  A    The only knowledge that I have -- again, it's third party

8  -- but that there was an issue brought up.  Initially, Mr.

9  Jett was addressing the Court and that Mr. Capps was also

10  addressing the judge himself directly about the travel.  So,

11  that's all that I was told.  As far as details of what was

12  specifically said, I have no knowledge of that.

13  Q    Okay.  So, what you know about what happened on January

14  10th is -- was told to you by someone else?

15  A    Correct.

16  Q    You don't have any personal knowledge of what transpired

17  in court or what, if anything, was conveyed to Mr. Capps; --

18  A    Correct.

19  Q    -- is that correct?

20  A    I was not present.

21  Q    Okay.  So, a sheet called Additional Conditions of Release

22  was attached to the Order Setting Conditions of Release.  Is

23  that correct?

24  A    That's correct.

25  Q    Okay.  And there was Number 7(b) listed as a condition

1    that Mr. Capps continue or actively seek employment, correct?

2    A    Correct.

3    Q    Okay.  And so working or trying to work was a condition of

4    his release that was ordered by the Court?

5    A    That's correct.

6    Q    All right.  Then we are here today on an alleged violation

7    of Condition 7(f), correct?  That is, to abide by the

8    following restrictions on personal association, residence, or

9    travel?

10   A    That is correct.

11   Q    All right.  And if you have a copy of that page entitled

12   Additional Conditions of Release, travel is circled and there

13   is a handwritten notation next to it saying, Restricted to

14   NDTX.

15   A    I'm sorry.  You're talking about the supplemental?

16   Q    Correct.  It's called Additional Conditions of Release.

17   A    Oh, gotcha, --

18   Q    Okay?

19   A    -- the Page 2.  I'm sorry.  Can you repeat your question?

20   Q    Right.  Travel is circled on Condition 7(f), --

21   A    That is correct.

22   Q    -- with a handwritten notation, Restricted to NDTX.

23   A    That is correct.

24   Q    Is that right?  Okay.  Now, when Mr. Capps was processed

25   to be released on January 10th, is it your understanding that

Evans - Cross                                        21

1   at that time he was instructed to meet with you on Tuesday,

2   January 14th?

3   A    That is correct.

4   Q    All right.  And was the meeting early in the day on

5   January 14th?

6   A    Yes.

7   Q    Was the meeting at 8:00 o'clock in the morning on January

8   14th?

9   A    I don't have my calendar in front of me, but I'm pretty

10  sure it was.

11  Q    Okay.  Now, you have provided the GPS documentation to the

12  U.S. Attorney's Office, and that has now been introduced into

13  evidence, right?

14       Mr. Capps did go to Plano on Monday, January 13th; is that

15  correct?

16  A    That is correct.

17  Q    Okay.  So we have the initial appearance and arraignment

18  on Friday, January 10th, and he goes to Plano on January 13th.

19  Did he ever tell you in any subsequent discussion why he'd

20  gone to Plano on January 13th?

21  A    Not specifically that I can recall.  I know he had, when

22  we were discussing travel and --

23  Q    Uh-huh.

24  A    I know he had accounts or --

25  Q    Right.  Did he tell you, to -- you don't recall that he

Evans - Cross                                    22

1    told you he had a business meeting in Plano on January 13th?

2    A    No.

3    Q    Okay.

4    A    No.  But he did tell me during his intake on the 14th, he

5    said, I have meetings up there today.  And I said, I'm sorry.

6    Until --

7    Q    Okay.

8    A    -- the judge modifies.

9    Q    Right.

10   A    He did not know --

11   Q    And he told you that he was going to cancel those meetings

12   that he had scheduled later in the day on Tuesday?

13   A    I don't recall what he told me he was going to do, but --

14   Q    Okay.

15   A    -- with regard --

16   Q    You don't have any subsequent reports of violation with --

17   A    That is correct.  He did not go --

18   Q    All right.  So, --

19   A    -- on that date.

20   Q    And had he gone, most assuredly, given the reliability of

21   the GPS tracking device, you would have had those reports?

22   A    That is correct.

23   Q    Okay.  So, it's been your testimony that on January 14th

24   you went over those conditions of pretrial release with Mr.

25   Capps in an extremely thorough and detailed manner?

1    A    I believe I did.

2    Q    Okay.  Because that is what you do in every case?

3    A    I believe so.

4    Q    All right.  And for the first time, on January 14th, Mr.

5    Capps was given a map specifying the boundaries of the

6    Northern District of Texas; is that correct?

7    A    That is correct.

8    Q    Okay.  And he said nothing about his excursion to Plano on

9    Monday, January 13th?

10   A    That is correct.

11   Q    Okay.  And you fault him for that?

12   A    I'm sorry?

13   Q    You fault him for that, for not volunteering at that

14   moment that he had gone to the Eastern District?

15   A    I don't know that I would say that I fault him for that.

16   I just --

17   Q    Okay.

18   A    -- think that that's certainly an issue, that he didn't

19   disclose that.  This -- we probably wouldn't be having this

20   hearing had he disclosed that.

21   Q    But from the moment that you reviewed in tremendous detail

22   the conditions of probation and provided him with a map

23   designating the boundaries of the Northern District, we have

24   had no subsequent violations on the part of Mr. Capps?

25   A    That is correct.

1  Q    All right.

2  A    With regard to travel.

3  Q    Also, in the meeting on January 14th, Mr. Capps brought

4  with him, he brought with him to that meeting an Apple MacBook

5  Pro 13 computer that he told you was a refurbished MacBook

6  computer and also an iPhone 11 Pro, which he also told you had

7  been refurbished?

8  A    He had, yes, indicated that that was --

9  Q    Did he bring you those devices, Ms. Evans, to that meeting

10 on January 14th?

11 A    I did not see them.  He indicated that they were out with

12 the bluecoats.

13 Q    Pardon me?

14 A    I did not physically view them.  He had stated that he had

15 brought them with him.  They were kept out at the security

16 desk --

17 Q    Okay.

18 A    -- with the security officers.

19 Q    Okay.  If you had been interested in seeing those devices,

20 could you have seen those devices?

21 A    Absolutely.

22 Q    Okay.  And also, when he told you that he had brought

23 those devices and told you that they were refurbished, you

24 warned him that if there had been any trace of anything

25 questionable or illegal that might show up, maybe from a

Evans - Cross                                    25

1    previous owner of that computer, that would violate the terms

2    and conditions of his release, that he would be in big trouble

3    for that?

4    A    As I stated, we prefer clean computers.

5    Q    Did you tell him that, Ms. Evans?

6    A    Not in your words, I did not.

7    Q    Okay.  How did you tell him?

8    A    Okay.  So, we explained to him that a clean computer is

9    mostly preferred, one that is sealed and out of the box,

10   because a refurbished, should there have been anything

11   inappropriate on there that would subsequently appear, he

12   would be held accountable for that, --

13   Q    Okay.

14   A    -- which could, in turn, become a violation.

15   Q    Okay.  Did you tell him that he needed to buy a new sealed

16   phone?

17   A    We told him that that was going to need to occur as well.

18   Q    And did you tell him that he needed to bring a receipt for

19   that new sealed phone?

20   A    Correct.  All of the equipment, we were going to need a

21   receipt for.

22   Q    Okay.  And you made it clear at that meeting on January

23   14th that any device, any electronic device used by Mr. Capps

24   must be approved by presumably you before any software could

25   be installed on that device?

1    A    That is correct.

2    Q    Okay.  And -- okay.  Now, when Mr. Capps was in that

3    meeting on January 14th, you did not know that he had gone to

4    the Eastern District the day before?

5    A    That is correct.

6    Q    In fact, you did not learn about that until you received

7    -- presumably received the GPS report on January 24th?

8    A    I did not -- it was before January 24th, but it was -- the

9    way we review individuals who are on curfew is different than

10   the way we monitor and review individuals who are on home

11   detention.  So that's when it was discovered.

12   Q    Okay.  Also, you testified that during that same meeting

13   on January 14th Mr. Capps told you that his employer was

14   unaware of the legal issues.  Did he tell you they were

15   completely unaware of the legal issues on that date?

16   A    He just said they were unaware.

17   Q    Okay.  And you told him to talk to his employer about his

18   legal issues; --

19   A    That is correct.

20   Q    -- is that correct?  Then you said that you had a

21   conversation with Mr. Jett on January 15th; is that correct?

22   A    That is correct.

23   Q    And the substance of that conversation was to instruct him

24   to notify his employer about his legal status?

25   A    No.  Mr. Jett reached out to me to discuss the travel

1    issue.

2    Q    Uh-huh.

3    A    And he had questions, and I informed him that until a

4    motion is filed and the judge approves Eastern District

5    travel, he cannot travel there.  I told him that I completely

6    -- he may -- he has my permission to put in his motion that I

7    support the travel to Eastern District.

8    Q    Uh-huh.

9    A    Plano.  For his employment.  And that he may include that

10   in his motion to Judge Ramirez.  I explained to him about why

11   -- it was a pretty extensive conversation.  I explained to him

12   about why Mr. Capps could not travel overnight.  And we -- he

13   asked me several questions, scenarios, what have you.  So, --

14   Q    Okay.  Have you had any discussion with Mr. Capps about

15   when and -- when he had a discussion with his employer and

16   what was told to the employer?

17   A    So, on the date of the intake, the initial appointment on

18   the 14th, he -- that's when he advised that he had not

19   disclosed.

20   Q    Are you aware that he did disclose on January 15th?

21   A    No.  I am not aware of that.

22   Q    Okay.

23   A    I'm not aware of that.

24   Q    Okay.  So, you -- you have not been told, then, by either

25   Mr. Capps or by anybody in Geoverse or the parent company that

1    there was some communication on January 15th regarding his

2    legal status and charges?

3    A    I was notified on January 16th.

4    Q    Okay.  Okay.  And were you notified by Mr. Capps?

5    A    Yes.  We spoke.

6    Q    Okay.  And did he tell you that the day before, on January

7    15th, he had told his employer that his travel was severely

8    restricted and that he must have the monitoring software?

9    A    We did not discuss the monitoring software.  All he

10   informed me was that he notified his employer that he had

11   legal issues for which monitoring -- I'm sorry, monitoring is

12   required, and he stated that his employer, my apologies, that

13   his employer put him on a temporary vacation from access to

14   his online tools.

15   Q    Okay.  Okay.  Do you known with whom he spoke at that

16   company?  Did he give you any names at that point?

17   A    No.  Because he also told me that he was not sure if he

18   was going to disclose the details of his charges at that time,

19   and that's why I let him know that I have to have somebody to

20   verify with.

21   Q    Did he tell you that his attorney had instructed him not

22   to disclose the specific charges to his employers?

23   A    He informed me that he may meet with his -- oh, I'm sorry.

24   All he told me was that he may meet with another attorney

25   today, which is January 16th -- oh, excuse me -- and has an

Evans - Cross                                          29

1    appointment with Mr. Jett tomorrow.

2    Q    Okay.  Did he tell you on January 16th -- that was just a

3    telephone conversation that you had with Mr. Capps on January

4    16th; is that correct?

5    A    That is correct.

6    Q    And, in fact, did he call you to tell you that he had

7    notified his employer the day before about his travel

8    restrictions and that there would be the requirement of

9    monitoring the software?

10   A    That is correct.  That's when he notified me that he was

11   on vacation from his online access tools.

12   Q    Okay.  So he didn't tell you that he had spoken

13   specifically with his immediate supervisor, Peter Spouse?

14   A    I don't recall.  It's not in the chronos of the

15   conversation.  So if he --

16   Q    Okay.

17   A    -- did specifically inform me that it was Mr. Spouse, I

18   certainly would have put that in there.  But --

19   Q    Okay.

20   A    -- it's not in there.

21   Q    Okay.  And you don't, I assume, have any chronological

22   note that he also spoke to the Geoverse CEO, Rod Nelson?

23   A    I've never heard that name.  I have no idea --

24   Q    Okay.

25   A    -- who that gentleman is.

1    Q    And you don't recall whether he told you that Rod Nelson

2    told him to take it up with Legal and Peter, who would have

3    been Peter Spouse, his immediate supervisor?

4    A    He did not relay that information to me, no.

5    Q    Okay.  Have you ever, in the course of your supervision of

6    Mr. Capps, spoken with Peter Spouse?

7    A    No.  I left him a voicemail and he did not return my phone

8    call.  Instead, he had a gentleman by the name of Mike

9    Masciarelli, who, it's my understanding, is --

10   Q    Uh-huh.

11   A    -- the head of HR --

12   Q    Uh-huh.

13   A    -- for Geoverse.  Excuse me.  AT -- pardon me.  AT --

14   Q    The parent company of Geoverse?

15   A    Yes.

16   Q    All right.

17   A    Yes.

18   Q    Do you have any knowledge as to when Mr. -- did he tell

19   you that he never received a response from his supervisor,

20   Peter Spouse, or from anyone until a week later, January 22nd?

21   A    Well, his wife forwarded me -- so, yes.  When he and I

22   spoke again on the 22nd, I asked him, what's the status of

23   notifying his employer?  That's also when he let me know that

24   he retained you.

25   Q    Uh-huh.

Evans - Cross                                    31

1    A    On January 24th is when I received the email from his

2    wife, and she included, you know, the email that was sent and

3    a response from Peter Spouse.

4    Q    Okay.  Now, you did state that also in that January 15th

5    conversation with Mr. Capps that he told you, to use your

6    word, that he was on vacation from -- from what?

7    A    That he was on a temporary vacation from his access to his

8    online tools.

9    Q    Okay.  So, did he tell you specifically that he no longer

10   had access to Geoverse technology systems?

11   A    All he told me was that he was not accessing emails.  They

12   were being diverted to his supervisor.

13   Q    Okay.  And did he tell you that he hoped that his now

14   being suspended to the Geoverse IT systems would somehow

15   nullify or obviate your requirement that the company approve

16   the monitoring software?  That you could, in other words, you

17   could go ahead and install the monitoring software?

18   A    He loosely alluded to that, but I told him, I said, I

19   still can't without verification from the employer that he's

20   suspended.  I can't -- I still can't go in and have that

21   monitoring software installed.

22   Q    Uh-huh.  With regard to the need to have the approval of

23   the employer before you put on the software, it is a legal

24   duty, a requirement that you have to notify the employer?  You

25   --

Evans - Cross                                          32

1    A    Yes.

2    Q    Okay.  And you and I have discussed that, and clearly you

3    have a duty, if you install this type of monitoring software

4    on someone's device that they use for work, whether that

5    device be a personal device or whether it be a device issued

6    by the company or the employer, they must know, because, as in

7    this case, proprietary information of the employer might be

8    accessed, --

9    A    That's correct.

10   Q    -- correct?  And that's really the reason why you have

11   that legal duty to notify?

12   A    That is correct.

13   Q    Right.  They have a right to know that their proprietary

14   information, systems, whatever it is they do, could be

15   monitored by a third party --

16   A    That is correct.

17   Q    -- and accessed, right?  And so on January 15th -- okay.

18   So we go back on the 14th, in the meeting.  He took you a

19   phone and a computer to the office, although it was left with

20   security, and said, Hey, I have my devices here with me today.

21   Is that right?

22   A    He did.

23   Q    I mean, he wasn't dodging his responsibility in any way to

24   have monitoring software installed?

25   A    Oh, I would agree.

Evans - Cross                                        33

1    Q    Okay.  That -- but he was turned down.  And my

2    understanding is he was turned down to have the software

3    installed because we still did not have resolution as to his

4    employment?

5    A    That is correct.

6    Q    Okay.

7    A    And then also the issue of refurbished equipment, that

8    that would be a risk he would --

9    Q    Okay.

10   A    -- take on himself.

11   Q    Right.  So, so the discussion, then, on the 15th also was,

12   even though he said, Now I've been suspended, or maybe he used

13   the words, I'm on vacation for what I do for a living,

14   essentially, maybe we can put the monitoring software on now,

15   the thinking being, Since I can't even access those systems,

16   maybe we could put the software on.  I mean, --

17   A    That was not brought up on the 16th.  He did not --

18   Q    No, on --

19   A    -- inquire about having --

20   Q    On the 15th, when you had that conversation.  That's what

21   he told you --

22   A    I didn't speak to him on the 15th.  I spoke to Mr. Jett.

23   Q    Spoke to him.

24   A    I spoke to Mr. Jett on the 15th.

25   Q    Okay.

1    A    I spoke with Mr. Capps on the 16th.

2    Q    Right.  Okay.  Okay.  So when -- what date was the

3    conversation, then, when he told you he was on vacation from

4    the IT situation?

5    A    It was January 16th.

6    Q    16th?  Okay.

7    A    Yes, ma'am.

8    Q    All right.  So he did as he was instructed on January --

9    he did, on January 15th, what you told him to do in your

10   meeting on January 14th?  He notified his employer that he had

11   these restrictions?  And they said, Well, by the way, you've

12   already been suspended and -- so then did he ask you on the

13   16th whether you could go ahead and install the software?

14   A    We did not discuss that, to my -- according to my notes.

15   The only thing we discussed was him shutting down his social

16   media sites, --

17   Q    Uh-huh.

18   A    -- with which I explained to him again, to protect

19   himself, --

20   Q    Uh-huh.

21   A    -- to go to Mr. Jett's office and access a computer with

22   Mr. Jett present --

23   Q    Uh-huh.

24   A    -- and shut down those sites in the presence of his

25   attorney, --

1    Q    Uh-huh.

2    A    -- so that if he was being watched by FBI or whomever, his

3    attorney was there, --

4    Q    Okay.

5    A    -- and I had directed him and his attorney was there.

6    Q    Okay.

7    A    That's all we discussed.

8    Q    Okay.  Now, are you aware that Mr. Capps did not hear back

9    from his employer, didn't get a response to his telling his

10   employer that he had travel restrictions and had to have his

11   devices monitored, are you aware that he received no response

12   until January 22nd?

13   A    That is correct.  That's what his wife --

14   Q    Okay.

15   A    -- provided me, was the 22nd.

16   Q    So, --

17   A    However, if I may?

18   Q    Uh-huh.

19   A    On the 16th, when he was acknowledging that he was on

20   temporary vacation, he indicated that his employer needed more

21   details, and he wasn't sure if he was going to provide his

22   employer with those details.  So I don't know what transpired

23   between the 16th and the 22nd.

24   Q    Did he tell you what details they were that his employer

25   wanted to know?

Evans - Cross                                        36

1    A    He did not.

2    Q    Okay.  Okay.  Okay.  On Friday, January 24th, did you send

3    Mr. Capps an email telling him that he was not compliant with

4    his monitoring?

5    A    I did not.

6    Q    Okay.  But while the monitoring was required, he wasn't

7    permitted -- it was ordered by the Court.  I mean, the plain

8    letter of the Court's order is to have the monitoring

9    installed.

10   A    I sent an email to his wife on that date --

11   Q    Okay.

12   A    -- discussing monitoring software.

13   Q    Okay.  Okay.  But there was, then, let's -- okay.  You

14   might not have sent it directly to him, but you communicated

15   with his wife, and essentially, I think it's fair to say,

16   communicating with Mr. Capps indirectly through his wife that

17   he was not compliant with the monitoring?

18   A    I stated in my email to his wife, that's when I

19   acknowledged that I had computer issues myself.  I was

20   referencing her question about forfeiting.  There was

21   something that did not make sense to me.  I said, Either way,

22   this delay in having the software installed or a verification

23   call with his employer could certainly cause an issue with the

24   Court's expectations for having this resolved.

25   Q    Uh-huh.

1    A    I said, Hopefully, this helps.  I'll be back in the office

2    on Monday.

3    Q    Uh-huh.  So, you suggested that there was an undue,

4    unnecessary delay in having the monitoring software installed,

5    and yet they were, I would suggest, patiently waiting for the

6    employer to get back to them about what their intentions were.

7    I mean, I think we've agreed that he notified his employer

8    about his restrictions on January 15th, as you instructed him

9    to do on the 14th, and he didn't hear back until the 22nd.

10   And --

11   A    It was my understanding that they needed more details --

12   Q    Uh-huh.

13   A    -- and he was not certain if he was going to provide those

14   details.  I think that, in my professional opinion, assessing

15   as an outsider, perhaps that could have been the delay.

16   Q    Did he say, No, I'm not going to provide details?  When

17   did -- did he make that assertion to you?  And if so, when --

18   when did he do that?

19   A    He stated on the 16th -- again, that's the vacation from

20   access to his online tools.  He advised he was not sure if he

21   was going to disclose the details of his charges yet.

22   Q    Okay.  So the details they wanted to know was what he was

23   accused of --

24   A    I would assume so.

25   Q    -- specifically?  But you don't know for sure?

Evans - Cross                                    38

1    A    I don't know for certain.

2    Q    Okay.  So, for example, you don't know whether the details

3    they wanted to know were more details about the software

4    monitoring program?

5    A    Correct.

6    Q    I mean, you really have no idea?

7    A    Don't know.

8    Q    In fact, in a conversation that you had with Mr.

9    Masciarelli on Wednesday, didn't he ask you more details about

10   the software monitoring program?

11   A    He did, and I, in trying to balance out -- I could have

12   fully disclosed everything to him, because this is public

13   record.  However, I --

14   Q    You did do that also on the 29th, didn't you?

15   A    No, ma'am, I did not.

16   Q    So if Mr. Masciarelli told me that he already knew what

17   the charges were, that you had provided him with the case

18   number and the nature of the charges, that would not be true?

19   A    That's partially correct.  He was provided with the case

20   number, not the nature of the charges.  And then the specific

21   conditions that needed to be referenced and addressed with him

22   were addressed with him.  But he was not notified the nature

23   of the charges.  And I can assure you of that.  There were

24   other people in my office --

25   Q    Okay.

Evans - Cross                                    39

1    A    -- during that phone call.

2    Q    Did you tell him it was easy enough to find out, here's

3    the case number, look it up?

4    A    Not in those words.  No, ma'am.

5    Q    Okay.  Was that the gist of it?

6    A    I think that's -- those words are a little -- not fair to

7    the Defendant.  I explained --

8    Q    Was that the gist of your conversation with Mr.

9    Masciarelli?

10   A    Not in -- according to your terms, no.

11   Q    All right.  So, notwithstanding, you're suggesting that --

12   to Mr. Capps via his wife that, you know, you need to get

13   compliant with this monitoring, the message he was also

14   getting was, you know, figure out things with your employer?

15   A    That is correct.

16   Q    And would you agree that it's fair to say that the

17   employer was still unsure as to what course they were going to

18   take?

19   A    Perhaps.

20   Q    Okay.  And, in fact, well, you knew as late as Wednesday,

21   when you spoke with Mr. Masciarelli, that they were still

22   unsure what they wanted to do?

23   A    I'm going to have to double-check the date.  January 28th

24   was --

25   Q    Two days ago, on Wednesday, January 29th.

1    A    That is correct.

2    Q    Okay.

3    A    That is correct.  We weren't -- I didn't -- I didn't know

4    what they were going to do.

5    Q    Okay.  All right.  And, in fact, you and I did -- on

6    Monday -- okay.  So you sent his wife, Gail, an email on

7    Friday, January 24th.  And you received a call from Mr. Capps

8    on Monday, January 27th?

9    A    That is correct.

10   Q    And he called you to ask if he would -- if he could meet

11   with you that day, this past Monday, this week?

12   A    Well, no, he was offering to just come in.

13   Q    Okay.  Well, he wanted to meet with you, clearly?

14   A    Yes.

15   Q    All right.  And you agreed, and you met with Mr. Capps in

16   your supervisor's office, correct?

17   A    That is correct.

18   Q    Okay.

19   A    We met with him on January 28th.

20   Q    Okay.  So he sat down with, I understand, both you and

21   your supervisor, Mr. Bruno Perez.

22   A    That's correct.

23   Q    Is that correct?  And he -- did he bring you, on that

24   meeting, a new sealed iPhone 8, with a receipt to show you

25   that it was a clean phone?

Evans - Cross                                        41

1   A    He did.

2   Q    Okay.  So I think you'd agree with me that he made an

3   effort to satisfy your request that he have a new, clean --

4   not a refurbished phone, but a clean device; is that correct?

5   A    That is correct.

6   Q    And did he express to you in that meeting that he was

7   hoping that you could install the monitoring software right

8   then and there?

9   A    Pretty much, and that's when we explained to him the

10   process and the protocol, along with the issue with the

11   employer.

12   Q    Okay.  And at that meeting, did Stewart Siegel walk by

13   your office and did you ask Stewart Siegel whether the

14   monitoring equipment, monitoring software could be installed

15   on an iPhone device?  Do you recall having that --

16   A    We discussed, yes, the monitoring software being -- I know

17   that it can be installed on iPhones, so I don't recall that I

18   specifically --

19   Q    Okay.

20   A    -- would have asked him that again.

21   Q    Okay.  So, you, once again, declined even to make the

22   arrangements for the installation of the monitoring software

23   because, in your determination, the employment situation still

24   had not been resolved?

25   A    That is correct.

1    Q    So I guess, to be clear, did he either need to have

2    affirma... you needed to have an affirmative assurance from

3    the employer that he could have the software, or he wasn't

4    going to be required to use the software, or he just needed to

5    be fired?  Some condition needed to be met in that regard?

6    A    He -- he needed notification from the employer that either

7    (a) they were agreeable to him using his equipment with the

8    monitoring software on to access their information in the

9    performance of his duties, or we needed notification that they

10   were going to issue him their, pardon me, their employer-

11   issued technology, at which point we would have to go another

12   route.

13        So, yes, we needed assurance before -- we can't just

14   arbitrarily install this software.  And we also have to have

15   an appointment with the monitoring company for it to be

16   installed.

17   Q    Okay.

18   A    He was told this several times.  You can't just come up

19   here and expect that it's going to be installed right now.

20   Q    You and I -- now, I called and left you a voicemail

21   message on January 28th, correct?

22   A    I'm sorry.  My records show January 29th.

23   Q    Okay.  You and I first spoke on January 29th.  My records

24   reflect that you returned my call on January 29th.

25   A    Okay.

1   Q    Is that right?

2   A    Yes.

3   Q    You don't dispute that?

4   A    You called me that evening, correct.  You called me that

5   evening on the 28th, and I phoned you first thing in the

6   morning on the 29th.

7   Q    Okay.

8   A    That is correct.

9   Q    All right.  And you were telling me that he needed to get

10  that software program on his devices and that he needed to

11  talk to his employer; is that right?

12  A    Yes.

13  Q    Okay.  And the other part of that message was you told me

14  that you were going to leave the chore to me to inform Mr.

15  Capps that he could not use that iPhone that he had gone up to

16  your office with an iPhone and he couldn't use that and he

17  knew it and he had to get an Android phone?  And you told me

18  to, in no uncertain terms, to tell him to go out and buy an

19  Android phone?

20  A    Okay.  I'm going to disagree with your summary of that.

21  Q    Okay.  Did you or did you not tell me that, --

22  A    I asked --

23  Q    -- to tell him to buy an Android phone?

24  A    I asked you to ask him to buy an Android phone.  That is

25  correct.  But as far as the other terminology you're using, I

1    did not use that terminology with you.

2    Q    Yeah.  But you didn't tell Mr. Capps on January 27th, when

3    he came to your office with an iPhone, that he had to get an

4    Android phone, did you?

5    A    And that is correct, because there was an issue that had

6    arisen that Stewart notified me that, with the nature of his

7    charges and, again, the monitoring software, which I'm not

8    going to go into because that is information related to the

9    performance of our duties --

10   Q    Uh-huh.

11   A    -- that we don't disclose to the defendants, that, in his

12   situation, an iPhone would not be acceptable.  And yes, I did

13   ask you to tell him, because every conversation that we would

14   have with Mr. Capps, there would be pushback, and I felt it

15   would be better received coming from you since you're his

16   attorney.

17   Q    Okay.  Well, would you agree with me that that would have

18   caused some confusion?  He was told that everything was fine

19   with an iPhone on January 27th, and yet I had to tell him on

20   January 29th that it was not fine, and I had no reason to give

21   him for that, you would agree?

22   A    That could have caused some confusion.  That is correct.

23   Q    Okay.  And you told me when we spoke on January 29th that

24   the employer, Mr. Capps' employer -- I assume you spoke with

25   Mr. Masciarelli.  Is that correct?

1    A    That is correct.

2    Q    And he is head of the HR Department --

3    A    That is correct.

4    Q    -- of Geoverse?  He --

5    A    Of A --

6    Q    -- asked you when, if and when his restrictions could be

7    lifted?

8    A    That was through email.  But, yes, I responded to him.

9    Q    Okay.  And you had communication with him that, in your

10   professional opinion, based on your experience, the life of a

11   federal case was typically between six months and two years?

12   A    My email stated that it was typically between six and nine

13   months.  However, it could be longer than that.

14   Q    Okay.  And did he still express concern and have

15   additional questions about the third-party monitoring of the

16   software?

17   A    That was not communicated in the email, so if he did, I'm

18   not aware of that.

19   Q    Okay.  So you don't recall telling me that in a

20   conversation on January 29th, --

21   A    That --

22   Q    -- two days ago?

23   A    We -- he and I discussed that.  I apologize.  I thought

24   you were referring to his email.

25   Q    Okay.

1   A    Are you referring to the phone call?

2   Q    Communication.  Whether it was email or a telephone call.

3   A    I'm sorry.  Then what is your question?  I'm sorry.

4   Q    Okay.  Did he express, in whatever form of communication

5   that you had, that he still had questions and concerns about

6   the monitoring software?

7   A    That is correct, and that was an issue he had to continue

8   exploring.

9   Q    Okay.  And did he specifically ask you whether the

10  monitoring software would have access to cloud-based

11  applications?

12  A    He sent me a statement affirming -- I'll have to reference

13  it because -- so, he stated, let's see.  That said, any

14  devices that Mr. Capps would need access to our platform of

15  business application, which are cloud-hosted, not server-

16  hosted.  I don't know what that means, and I did not respond

17  back on that.

18  Q    Okay.  And you weren't able to assuage his concerns or

19  answer the questions about what the software would or would

20  not do?

21  A    Because further on in the email Mr. Masciarelli stated, We

22  will reach out to Mr. Capps and hopefully be able to have an

23  open dialogue.

24  Q    Okay.  Now, and you emphasized to me yet on January 29th,

25  when we first spoke, that he needed to get that software on

Evans - Cross                                    47

1    his devices?

2    A    I -- yes.  You and I --

3    Q    Okay.

4    A    -- chatted that it was a requirement.

5    Q    Okay.  Now, you now know, based on our conversation of

6    yesterday afternoon, that Mr. Capps called his employer on

7    January 29th and discussed further the legal issues in his

8    case?

9    A    You notified me of that yesterday.  That is correct.

10   Q    Okay.  And we had a conversation about that?

11   A    That is correct.

12   Q    And it was also in that conversation I told you that Mr.

13   Capps had lost his job?

14   A    That is correct.

15   Q    And I told you he didn't, according to -- and my

16   conversation and Mr. Capps' conversation, both in the

17   afternoon of January 29th, the conversations were with Mr.

18   Masciarelli, the same person with whom you'd been

19   communicating, correct?

20   A    That is correct.

21   Q    Okay.  And I told you in that conversation that Mr.

22   Masciarelli represented to me that he was not terminating Mr.

23   Capps because of the allegations against him but that he was

24   terminating him because he couldn't get good answers about the

25   way that software worked?

Evans - Cross                                   48

1   A    No, ma'am.  We did not have that discussion.

2   Q    Okay.  And, well, I suggested to you that he said that he

3   might reconsider hiring Mr. Capps again if he could get better

4   answers to the software, --

5   A    No, --

6   Q    -- but for the time being his employment was terminated.

7   A    We did not have that part of the conversation.

8   Q    Okay.  So you were, I think it's fair to say, annoyed

9   yesterday because you said that Mr. Capps had been calling

10  Stewart Siegel repeatedly about getting the software

11  installed; --

12  A    That is correct.

13  Q    -- is that correct?  And you told -- and I -- I even asked

14  you, what does he do to get the software installed?

15  A    That is correct.

16  Q    And I told you I really wanted him to have the software

17  installed before we came to court today?

18  A    That is correct.

19  Q    Okay.  And you told me that there had to be an appointment

20  and that it would be installed remotely?

21  A    That is correct.

22  Q    And yet he still had not had devices approved for the

23  installation of the software?

24  A    I'm sorry.  I'm not understanding your question.

25  Q    Had you approved his devices for the installation of the

1   software?

2   A    Well, I believe once the employment, which the employment

3   was presented to myself yesterday around 3:30, I confirmed by

4   email with Mr. Masciarelli that he was indeed terminated, at

5   which point we would be able to proceed in having Stewart

6   reach out to RemoteCOM today.  However, I did tell you that we

7   should probably wait at this point to see what the judge is

8   going to decide.

9   Q    Okay.  But I told you that he had, in fact, gone out and

10  purchased an Android phone and a, you know, very simple brand-

11  new laptop computer; --

12  A    Yes.

13  Q    -- is that right?  Okay.

14  A    You did.

15  Q    And we were seeking to have devices approved and get the

16  software installed?

17  A    That is correct.

18  Q    Okay.  Yesterday, you and I had a discussion about the

19  requirement that the employer approve the installation of the

20  software before you could install the software, and I asked

21  you why wasn't it just required that Mr. Capps put on the

22  software and then notify the employer as to when the software

23  would be installed so that the ball would just be in the

24  employer's court, they would be forced into the decision, do

25  we keep on Mr. Capps as an employee or do we not?  And I --

1          MS. BERAN:  Your Honor, I'm going to object.  She's

2     been testifying several times about what she said to the

3     probation officer, and I think this line of questioning is not

4     proper in that manner.

5          THE COURT:  We've been going for more than an hour on

6     the software, which I -- we've covered it over and over again.

7     The only allegation in the petition is the unauthorized

8     travel.  Now, the compliance with the software issue goes to

9     whether he's going to follow my conditions, but the only

10    allegation alleged in the petition is the travel.

11         MS. GOODMAN:  Okay.

12         THE COURT:  So I think we've covered -- we've covered

13    a lot over and over.  I want to give you the opportunity to

14    present anything that you need to present, but I think I'm

15    very clear on --

16         MS. GOODMAN:  Okay.

17         THE COURT:  -- the efforts to get the software

18    installed before today, but I'm also very clear that there was

19    nothing definitive from the employer until the 29th for the

20    Defense, and the officer did not learn until yesterday that he

21    had been fired.  So I've got the deadline.  I mean, I've got

22    the timeline.

23         MS. GOODMAN:  Okay.  Then I'll pass the witness, Your

24    Honor.

25         THE COURT:  Ms. Beran, do you have any additional

1   questions?

2          MS. BERAN:  Not at this time, Your Honor.

3          THE COURT:  All right.  I've got a couple.

4                    EXAMINATION BY THE COURT

5          THE COURT:  All right.  Officer Evans?

6          THE WITNESS:  Yes.

7          THE COURT:  On the allegation that Mr. Capps traveled

8   outside of the district on January 13th, did you ever discuss

9   that with him?

10          THE WITNESS:  I did.

11          THE COURT:  Can you tell me about that?

12          THE WITNESS:  Yes.  So, once it was discovered, I, in

13   the course of a conversation on January 27th, and that's when

14   we were talking about an email that his wife had sent to me,

15   as a courtesy to him I let him know that we had had to file a

16   violation report with the Court because we had discovered that

17   he had traveled to Plano on January 13th, for which he

18   responded no, he did not.  And I re-stated again that yes, you

19   did, you're on GPS and I tracked you there, for which he

20   finally stated yes, I did.

21          THE COURT:  All right.  And did he tell you why he

22   initially denied it?

23          THE WITNESS:  He didn't provide an explanation as to

24   why he denied it.

25          THE COURT:  Did he tell you why he didn't disclose

1    that before or why he traveled there?

2            THE WITNESS:  He did not disclose that, either.

3            THE COURT:  Did you ask?

4            THE WITNESS:  I did not.

5            THE COURT:  Okay.  Any questions based on my

6    question?

7            MS. BERAN:  Just briefly, Your Honor?

8            THE COURT:  Uh-huh.

9                    REDIRECT EXAMINATION

10   BY MS. BERAN:

11   Q    Officer Evans, would you say that you had -- let me

12   rephrase that.  Is open and truthful communication important

13   to a defendant's success on pretrial release?

14   A    Absolutely.

15   Q    And do you feel as though there have been communication

16   issues in your supervision of Mr. Capps?

17   A    I -- I would say yes, thus far there has been some issues.

18   Q    And does it cause you concern with his ability to comply

19   with or be successful with the conditions of pretrial release

20   as a result of these communication issues?

21   A    I have some concerns.  I think the -- I think the travel

22   at this point is pretty well black-and-white and understood.

23   I think issues relating to another employer are going to

24   arise.

25   Q    But do you think his ability to communicate or his

1  inability to communicate openly and fully with you is going to

2  make it difficult to continue on pretrial release?

3  A    I think there's going to be some difficulties I foresee.

4  Q    Thank you.

5           MS. BERAN:  Nothing further, Your Honor.

6           THE COURT:  Ms. Goodman?

7           MS. GOODMAN:  No further questions of this witness,

8  Your Honor.

9           THE COURT:  You may step down, Officer Evans.

10      (The witness steps down.)

11          THE COURT:  Anything else from the Government?

12          MS. BERAN:  Nothing else, Your Honor, other than

13  argument.

14          THE COURT:  Ms. Goodman, do you have any evidence or

15  proffer?

16          MS. GOODMAN:  Your Honor, I would proffer some

17  contextual background conversation with regard to the

18  excursion to Plano on the 13th.

19          THE COURT:  All right.

20          MS. GOODMAN:  Mr. Capps, if he were to testify, would

21  tell the Court that after his initial appearance on Friday,

22  January 10th, and after the Court had set and entered an Order

23  Setting Conditions of Release, that his attorney did not go

24  over in -- at all, let alone in any detail, the conditions of

25  release.  He said that his lawyer, in a very general way, told

1    him, You've got to stay in the Northern -- North Texas.

2    You've got to stay in North Texas.  And that was his

3    understanding of what was required of him with regard to the

4    travel restriction.  That was Friday after court.

5         He, on Monday, went to a meeting that had already been

6    scheduled in Plano.  And I will note for the record that the

7    business colleague with whom he had that meeting, Mr. David

8    Person -- who's in the courtroom, should the Court have any

9    questions of Mr. Person and the nature of that meeting -- it

10   was a business meeting.  He went to discuss a presentation

11   that they were preparing for a client.

12        He did not know until the next day when he had the meeting

13   with Ms. Evans, at which time terms and conditions of his

14   supervised release were reviewed with him in tremendous detail

15   and he was given a map setting out the boundaries of the

16   Northern District that he knew that he could not go there.

17   And he did cancel all other meetings that he had scheduled in

18   the Northern District at that point.

19        When he had that meeting on the 14th, his thought process,

20   he would tell the Court if he testified, was I know not to do

21   that again and I'm not going to do that again.  And he has not

22   done that again.

23        That would be the substance of it.  Nothing else.

24             THE COURT:  All right.  Argument?  Do the parties --

25   sorry.  Was there anything else?

1          MS. GOODMAN:  That's it.  Can I confer with my

2    client, Your Honor?

3          THE COURT:  You may.

4       (Pause.)

5          MS. GOODMAN:  Nothing further by way of proffer, Your

6    Honor.

7          THE COURT:  Do the parties wish to argue?

8          MS. BERAN:  Just briefly, Your Honor.

9       As the Court noted, the violation here, as noted in the

10   petition, is the travel restriction.  And I know the Court

11   understands all of the other issues, and we will not go into

12   that.

13      If the Court will recall, Mr. Capps, through counsel and

14   personally at his initial appearance and his arraignment,

15   questioned the travel restrictions, and he also stated that he

16   understood them.  He then went to the Northern District -- or

17   left the Northern District of Texas.  Realized the next day,

18   presumably, even if he didn't know on the 13th, that he had.

19   Failed to basically alert his probation officer or Pretrial

20   Services officer to that, and then he denied going there.

21      It seems that Mr. Capps has an issue communicating with

22   the Pretrial Services and with his employer.  And it's

23   understandable, given the nature of the charges.  But they are

24   serious charges, and each of them carry a mandatory minimum of

25   five years, and he doesn't seem to understand that.

1     I think Mr. Capps' inability at this time to communicate

2  fully and openly and follow the conditions of pretrial release

3  are concerning, and we would request that the Court -- you

4  know, that there's -- that there isn't, at this time, if he's

5  not going to abide by them, any sort of conditions or

6  combination of conditions that are going to indicate that he's

7  going to -- that he should not be detained.

8            THE COURT:  Ms. Goodman?

9            MS. GOODMAN:  Your Honor, may I reopen to add one

10  additional point to the proffer?

11            THE COURT:  Well, you can argue it.

12            MS. GOODMAN:  Okay.  Thank you.

13     May it please the Court, Your Honor, the alleged violation

14  before the Court is Mr. Capps' excursion to Plano in the

15  Eastern District on January 13th.  Mr. Capps was not aware at

16  that time that he was in violation of his conditions of

17  release.  He had been told by his attorney, You're restricted

18  to North Texas.  He was told on January 14th that he could not

19  go to Plano.  He was given the parameters of the restrictions

20  on his travel by way of a map and oral instructions.  He has

21  not violated since.

22     It was not until later, I believe roughly January 24th,

23  when Ms. Evans said that she did, in fact, receive

24  confirmation via GPS that he had gone to Plano.  She

25  confronted Mr. Capps about that and called him, You've

1   violated your conditions of release.  You have gone to Plano.

2   And he said, no, I haven't.  And if proffered, Mr. Capps would

3   tell the Court that he understood her to have accused him of

4   violating that condition of release after his admonishment on

5   January 14th.  And he thought that she was saying that, since

6   the time of his admonishment, that he was in violation of the

7   condition of release.  It was not in any shape, form, or

8   fashion denying that he had gone on the 13th, but he did not

9   believe that he was in violation since that admonishment.

10       So, you know, any representation that's been made by Ms.

11   Evans -- well, I anticipate communication problems in the

12   future -- is just purely speculative.  I think Mr. Capps,

13   based on everything adduced before the Court, really has gone

14   to lengths to comply with the Court's conditions of supervised

15   release.  As the Court has heard, he has purchased three sets

16   of telephones and computers in an effort to satisfy pretrial

17   supervision.  He has had no violations since his admonishments

18   on January 14th.  We're talking about a sum total of three

19   weeks since his initial appearance.  I think it's a reasonable

20   -- it's reasonable to understand that those of us who are in

21   the system every day of the world understand every nuance.

22   But as Ms. Evans said, she's got 40 -- you know, she -- you

23   know, I have a lot of clients.  And the system moves quickly.

24   And, you know, someone gets arrested for a federal offense,

25   when they've had no criminal history whatsoever, they're

1    brought into the system, there's an immediate flurry of

2    activity.  There is the arrest or the surrender, the initial

3    appearance, the arraignment.  There's a courtroom proceeding.

4    Everything is unfamiliar to someone who's never been brought

5    into the system before.  There are stringent conditions of

6    release that need to be complied with.  And as it came out in

7    my questioning with Ms. Evans, even I did not understand

8    really that the employer's -- I didn't understand why she just

9    didn't tell him, you know, under -- you must get the software

10   installed now.  And I would suggest that a large part of the

11   confusion has been the delay with the employer.

12       But to infer that there will be communication problems in

13   the future I think is unreasonable, communication problems

14   that would impact his willingness and ability and assurances

15   that he will comply with conditions of release.  I think he's,

16   from my perspective and observation, he's made every effort to

17   do that.  There was a period in there, probably a week, when

18   he was just trying to handle this on his own.  He had made the

19   decision to switch attorneys.  He was in the process of doing

20   that.  He was, you know, looking for devices, trying to

21   salvage his job.  That was another area of his life that was

22   unraveling for him.  And I think he truly was trying to take

23   care of business on all fronts, and maybe with not the best

24   advice of counsel.  And even I, after my conversation with

25   Lisa Evans on the 29th, just told him to go get that software

1   installed.  Even I really did not understand some of the

2   details and ramifications of that.

3       So I would really implore the Court to give Mr. Capps an

4   opportunity to demonstrate that he will be perfect with regard

5   to adhering to terms and conditions of his supervised release.

6   Based on my observations and conversations with Mr. Capps, I

7   believe that he will.  I think today should be an opportunity

8   to clear the air and make sure that -- I think this proceeding

9   and the summons and the testimony is -- that's, I think, been

10  sufficient to get his attention that every single detail

11  matters.

12      So, thank you.

13          THE COURT:  Mr. Capps, if you would please stand.

14  Mr. Capps, in order for me to revoke your conditions, I have

15  to find either probable cause to believe that you've committed

16  a federal, state, or local crime while on release, or clear

17  and convincing evidence that you violated any other condition

18  of release.  Based on the testimony of Officer Evans and the

19  exhibit, I do find clear and convincing evidence that you

20  violated your condition of release by traveling outside of the

21  district without permission.

22      The second part of the test is whether I find that there

23  are no condition or combinations of conditions that will

24  assure either your appearance in court or the safety of the

25  community, or whether you're unlikely to abide by any

1    condition or combination of conditions of release.

2         I have a very clear recollection of our initial appearance

3    about three weeks ago.  I very specifically stated to you, a

4    federal judge placing you on conditions of supervised release

5    while you are awaiting trial on very serious federal charges,

6    that it was important that you understand your conditions of

7    release and that we would both be comfortable before you left

8    the courtroom that you understood your conditions of release,

9    and that later on, if a violation was established, I would

10   know that the violation was not the result of a lack of

11   understanding because we would both be comfortable before you

12   left that you understood your conditions of release.

13        I gave you an opportunity to fully review the written

14   conditions, including the condition for monitoring software

15   and the travel restriction.  I asked you if you'd had a chance

16   to review those conditions with your attorney.  You told me

17   you did.  I asked you if you had any questions for me and you

18   told me you did not.  I asked you whether by signing those

19   conditions you were telling the Court that you fully

20   understood your conditions, you agreed to follow those

21   conditions, and you understood what would happen if you did

22   not.  I explained that I am considered a zero-tolerance policy

23   judge, and the reason for that is that you're either going to

24   follow the court order that governs your conditions of release

25   while you are awaiting trial or you're not, and that I was not

1   going to be inclined to tell you later on that I really meant

2   it that time, that it was important that you understand then

3   that I really meant it.

4       I specifically recall the issue of travel to the Eastern

5   District being raised by your attorney after -- actually, you

6   raised it.  Your attorney had to stop you.  We discussed it,

7   and I specifically said on the record, File a motion and we'll

8   -- I'll look at whether or not that should be permitted.

9       Today, I've heard that it was your attorney's fault that

10  you didn't understand what the geographical limitations were.

11  I've heard that it was your employer's fault for not getting

12  back to you on the monitoring software.  I've heard that it

13  was the probation officer's fault for not getting the software

14  installed before today.  It's everybody else's fault.  I've

15  heard today that this is sufficient to get your attention,

16  when I specifically told you when I released you that I meant

17  it that day.

18      What I'm hearing is a lack of accountability and a lack of

19  appreciation or taking seriously what was very clearly

20  explained to you in person by a federal judge looking you in

21  the eye.  I told you on Friday what your conditions were, you

22  told me you understood them, and by Monday you violated.  You

23  didn't tell your officer on Tuesday that you'd made a mistake

24  when you realized it when you had a map and realized where

25  you'd been and where you weren't supposed to be.  And when she

1   confronted you with it, you denied it.

2       So it's just either a complete lack of understanding on

3   your part, which is inconsistent with what you told me the day

4   that I put you on conditions, or it is something else.  What

5   it is doesn't matter.  I am not convinced that you're likely

6   to abide by your conditions or combination of conditions

7   because you've already told me once that you understood them

8   and violated them three days later.  So I am revoking your

9   conditions of supervised release and remanding you to the

10  custody of the Marshal pending your trial in this case.

11      Good luck to you, Mr. Capps.

12      We are adjourned.

13          THE CLERK:  All rise.

14      (Proceedings concluded at 11:33 a.m.)

15                          --oOo--

16

17

18

19                      CERTIFICATE

20      I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
21  above-entitled matter.

22   **/s/ Kathy Rehling**                        **02/11/2020**

23   **/s/ Kathy Rehling**                **As Amended 02/27/2020**

24  _____      _____
    Kathy Rehling, CETD-444                      Date
25  Certified Electronic Court Transcriber

```
                              INDEX
                          Amended Index
```

PROCEEDINGS                                                    2

WITNESSES

Government's Witnesses     Direct Cross Redirect Recross Court

   Lisa Evans                  4     17    52              51

EXHIBITS

Government's Exhibits                        Identified Received

1   BI Total Access Mapping                       8         9

RULINGS                                                       59

END OF PROCEEDINGS                                            62

INDEX                                                         63


**E R R A T A**

   **Amended to include transcribed proceedings from 10:11:29**

**a.m. through 10:16:28 a.m., hereby incorporated into Amended**

**Transcript beginning at Page 6, Line 14, and continuing**

**through Page 10, Line 16.  All subsequent transcript**

**pagination amended accordingly.**